# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 13-00015-TLM** |
| **JEFFREY T. HESS,** | ) | |
| **dba H&H Twilight Land & Cattle,** | ) | **Chapter 12** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO CLAIM
_____

## INTRODUCTION AND BACKGROUND[1]

On January 4, 2013, Jeffrey T. Hess ('Debtor") filed a voluntary chapter 12 petition commencing this case.[2]  An amended chapter 12 plan, Doc. No. 89 (the "Plan"), was filed on October 7, 2013.

On November 5, 2013, an objection to confirmation was filed by creditor Gerardo Amaral ("Creditor") asserting his unpaid wage claim was not provided for under the Plan.  Four days earlier, Creditor had filed a proof of claim for

_____

[1]  In addressing the background and context, and certain contentions raised or implicated, the Court has taken judicial notice of its files and records in the chapter 12 case.  Fed. R. Evid. 201.

[2]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S. Code, §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure.

$19,777.50.  *See* Claim No. 19 (the "Filed Claim").[3]  Of the total amount of the

Filed Claim, $12,475.00 was asserted as a priority unsecured claim under

§ 507(a)(4), and the balance as a general (non-priority) unsecured claim.

Through a November 8, 2013, stipulation, Doc. No. 99 ("Stipulation"),

Creditor and Debtor agreed that (i) Creditor's objection to confirmation would be

withdrawn, (ii) Debtor would file an objection to the Filed Claim, and (iii)

Creditor's claim would be subsequently determined in amount and priority in

accord with the Code and Rules.  The Plan was confirmed on November 13, 2013,

with a provision for later adjudication of an objection to Creditor's Filed Claim

consistent with the Stipulation.  Doc. No. 104.

On November 22, 2013, Debtor filed an objection to the Filed Claim, Doc.

No. 108 ("Objection").  The Objection argued the Filed Claim should be

disallowed since Creditor was paid—often in cash—and so was owed less than

was claimed, and possibly nothing.

Following several stipulated extensions, the Objection was scheduled for

hearing on April 22, 2014.  On April 21, 2014, Creditor filed an amended proof of

claim asserting a total amount owed of $38,709.50, of which $10,480.50 was

asserted to be an administrative expense, $12,475.00 was claimed as a priority

unsecured claim under § 507(a)(4) and the balance as a non-priority unsecured

---

[3]  This claim is also in the record as Ex. 312.

MEMORANDUM OF DECISION - 2

claim.  *See* Claim No. 20 (the "Amended Claim").[4]

Debtor and Creditor testified at the April 22 hearing.  Exhibits 101–107,
and 300–314 were admitted by agreement of the parties.  The parties requested
and were allowed the opportunity to present their closing argument through
simultaneous written briefs, which have now been filed and reviewed by the
Court.

This Decision constitutes the Court's factual findings and legal
conclusions.  Rules 7052, 9014.

## FACTS

The evidence presented at hearing establishes the following.[5]

### A.    Debtor's business

Debtor operates a 240-acre farm and ranch near Nyssa, Oregon, and has

---

[4]  The Amended Claim was marked as Ex. 315 and addressed at length during the hearing through testimony, but it was never offered into evidence.  During hearing, and in response to Debtor's objection to consideration of this claim, the Court found that it was an "amended" (rather than independent) claim.  Further, Debtor acknowledged the change in amount claimed had been signaled in pre-hearing depositions and documents, and agreed the late filing would not require a continuance of the hearing as Debtor was prepared to address Creditor's assertions as set out in the Amended Claim.  As discussed below, the Court is required under § 502(b) to "determine the amount of such claim" when an objection is heard and "shall allow such claim in such amount" unless one of the exceptions of § 502(b)(1)–(9) apply.  Under the circumstances, the Court considers the Amended Claim as part of the record properly before it, notwithstanding Creditor's failure to seek admission of Ex. 315.

[5]  The Court's findings include its evaluation of the credibility of the witnesses and the weight to be given their testimony, even if such considerations are not specifically discussed.

MEMORANDUM OF DECISION - 3

done so since 1993.[6]  He presently runs about 200 head of cattle on federally-
owned ground under a Bureau of Land Management grazing permit, and also
grows alfalfa.

### B.    Hiring and employment of Creditor

Creditor was first hired by Debtor in 2006.[7]  Creditor fed and watered
cattle, irrigated farm ground, and drove a hay swather, rake and other equipment.
Debtor quit on March 15, 2013.

Debtor employed Creditor under a verbal agreement.  There are no writings
memorializing the terms of employment or compensation, though there are some
documents related to time worked and certain of the payments made.

Debtor agreed to pay Creditor $10.00 per hour for the time he worked.  His
wages would be paid "approximately" every two weeks.  Debtor directed
Creditor's work.

### 1.    Housing

In order to have Creditor close to the ranch and available to work, Debtor

---

[6]  Since Debtor resides in Nyssa, Oregon, in Malheur County, the proper venue for this
case is the District of Oregon.  However, based on a long-standing arrangement, approved by the
Judicial Conference of the United States and the courts involved, the Bankruptcy Court for the
District of Idaho administers bankruptcy cases arising in Malheur County, Oregon.

[7]  Debtor testified that Creditor's employment started in 2008; Creditor testified that his
employment began in 2006.  The difference is not material to the outcome of this case, as the
unpaid wages at issue are from 2009 forward.  However, the Court notes that the evidence
includes Creditor's W-2 statements from Debtor for 2007 (*see* Ex. 310 at 1 showing $32,495.00
in gross wages), clearly contradicting Debtor's testimony.

provided him a residence.  Debtor paid a third party rent of $400.00 per month for this residence (though he received a $50.00 per month discount if he paid three months at a time).  Debtor provided the residence to Creditor from some unidentified point in 2009 until Creditor quit on March 15, 2013.

Debtor, in pre-hearing briefing and at hearing, raised questions about Creditor's failure to provide due "credit" for the residence's rental value when calculating his unpaid back wages.  Debtor testified, though without specificity, that it was understood the rent would be deducted from wages otherwise due Creditor each month.  Indeed, in deposition testimony, Debtor asserted the rent amount was "taken off in a lump sum" on Creditor's biweekly or month pay, and "basically, it was, you know, the $400, so it was just taken off the gross."  Ex. 303, line 19, at 28 to line 2, at 30.

However, on the weight of the credible evidence, the Court finds there was no agreement under which Creditor would be responsible for that expense. Creditor testified that his wages would not be reduced by the rental expense, and Debtor provided that benefit (as well as a Debtor-paid cell phone, and other incidental expenses) in order for Creditor to be close to work and available as Debtor needed.

There was no written document of any sort establishing or corroborating Debtor's contention that Creditor was responsible for the housing cost, or that the

MEMORANDUM OF DECISION - 5

parties agreed to have the value of the housing deducted from Creditor's pay for labor performed. Debtor claimed there was a verbal agreement, but the Court discounts that assertion.[8] Moreover, none of the documentation introduced into evidence suggests that, at any time, Debtor actually reduced Creditor's pay based on a "deduction" for the housing rent, nor was there proof that it was "taken off the gross" on any payment made to Creditor.

The Court finds that there was no agreement under which Creditor would be charged with the rental expense or have the same deducted from or credited against his otherwise earned pay.

## 2.    Time cards and other records

In order to determine the number of hours Creditor worked, the parties used a time clock located in a pump house on the ranch. Creditor was allowed to keep the time cards. He provided the same to Debtor, who would pay him at the agreed $10.00 per hour rate. Creditor would surrender those cards to Debtor, who testified that he would then shred them or throw them in the "burn barrel."

---

[8]  In addition to the lack of evidence establishing such a verbal agreement, before an employer may withhold a housing expense from or deduct from or credit against an employee's wages, Oregon law requires a written authorization executed by the employee. *See* ORS § 652.610(3)(b). Further, the employer in such a situation is required to provide the employee on regular paydays with an itemized, written statement sufficient to show the amount and purpose of the deduction made during such period covered by the payment. *See* ORS § 652.610(1), (2)(a). *See also Presley v. Bureau of Labor and Industries*, 112 P.3d 485, 488 (Or. App. 2005) (concluding an employer was prohibited from applying a "credit" against wages owed employee for a used car that was provided to the employee because deduction against wages was not authorized in writing as required by statute). These are additional impediments to Debtor's rent "credit" or "offset" argument.

MEMORANDUM OF DECISION - 6

As noted, the parties' arrangement changed from payment by check (with withholdings) to payment by cash (without withholdings). This change occurred in November 2009 and continued until Creditor quit on March 15, 2013.

The evidence includes several time cards, spanning a period from December 28, 2009 to March 15, 2013. *See* Ex. 302, Exs. 103, 104. There are handwritten notations of hours in addition to time stamps. Both Creditor and Debtor testified that Creditor was allowed to insert by hand the time he started or finished work when it was inconvenient to drive or return to the pump house solely to use the time clock.[9]

Initially, Creditor did not retain the time cards. However, starting in 2009, Debtor failed to fully pay Creditor what was owed. As a result, Creditor began keeping copies of the time cards in order to verify the time he worked. In addition, Creditor kept notes in a "booklet" about the payments Debtor made to him for the same reasons. Exs. 102, 305.

Despite professing a belief in the importance of business records, Debtor admitted that, after some point in 2009, he no longer used an accountant, did not pay Creditor by check, provided no pay stubs, made no tax withholdings, and provided no W-2s. He relied solely on the time cards and Creditor's information

---

[9] In addition to the stamped times and hand-written times, several of the copies of the cards in evidence include notations made by the parties reflecting their calculations or other views on the data contained thereon.

MEMORANDUM OF DECISION - 7

in order to determine the time worked.  Pay was calculated at $10.00 per hour for that time.

### 3.    Accrued unpaid wages

Creditor calculated the unpaid portion of wages for 2009 forward as follows:

| Year | Amount Earned | Amount Paid | Shortfall | Balance |
|------|--------------|-------------|-----------|---------|
| 2009 | | | $  5,800.00 | $  5,800.00 |
| 2010 | $ 35,052.50 | $ 18,651.00 | $ 16,401.50 | $ 22,201.50 |
| 2011 | $ 31,160.00 | $ 20,700.00 | $ 10,460.00 | $ 32,661.50 |
| 2012 | $ 31,867.50 | $ 22,300.00 | $  9,567.50 | $ 42,229.00 |
| 2013 | $  5,250.00 | $ 14,000.00 | $ (8,750.00) | $ 33,479.00 |

*See* Exs. 101, 311.  The Amended Claim contains this same base data[10] except that the 2013 Amount Earned is adjusted from $5,250.00 to $4,312.50 (a reduction of $937.50), reducing the final balance of unpaid wages claimed owed from $33,479.00 to $32,541.50.[11]

Debtor challenges Creditor's calculations.  However, Debtor concedes he has no records from which Creditor's wages or payments or amounts due can be calculated or verified.  Debtor admitted he relied, during the period of Creditor's

---

[10]   The "base data" is the amount earned and the amount paid, from which the yearly shortfalls are determined.  Creditor's counsel uses different methods of showing the accrued balances due at the ends of each year, though reaching the same final total balance.

[11]   Creditor's assertions of other amounts (*e.g.*, "penalty wages") are addressed later. So, too, are questions of the application of payments made by Debtor.

MEMORANDUM OF DECISION - 8

employment, on Creditor's time keeping and records.  He finds himself in the same position now.  The only credible evidence before the Court about the total wages earned, amounts paid, and amounts left unpaid, came from Creditor.[12]

Given Debtor's lack of records, the focus was on Creditor's summaries. Debtor challenged those calculations in several ways.

### a.    The starting point

Debtor claims the 2009 shortfall of $5,800.00 is unsubstantiated.  However, it is clear that the Creditor's gross 2008 pay was $30,535.00 according to the pay stubs generated at the time Debtor used an accountant.  Ex. 301 at 10.  That $30,535.00 gross wage also appears in Creditor's 2008 W-2 provided by Debtor. Ex. 310 at 14.  This is similar to the 2007 W-2 to Creditor from Debtor of $32,495.00.  Ex. 310 at 1.  But the W-2 statement for 2009 that Debtor provided Creditor, Ex. 310 at 24, showed only $25,370.00 in gross wages.[13]  That amount is $7,125.00 less than in 2007 and $5,165.00 less than in 2008.  Even accounting for cash payments of $700 in November 2009 and $608 in December 2009, Creditor's total gross wages received would be $26,678.  Adding Creditor's asserted shortfall of $5,800 for a total earned of $32,478 still leaves him within the range of

---

[12]  Because payments were made in cash, some testimony at hearing addressed Debtor's records of cash withdrawals and deposits.  S*ee* Ex. 306.  None of this evidence proved to be probative of the issues, or even tangentially helpful.

[13]  Recall, Debtor went from payment by check, with withholdings, to payment by cash in the latter part of 2009.  The W-2 figure is therefore not conclusive.

MEMORANDUM OF DECISION - 9

documented yearly wages.[14]

The Court accepts, on the weight of the credible evidence, the $5,800.00 unpaid amount in 2009 as a starting point.

### b.    Quality of record keeping

Debtor decries the completeness of Creditor's record keeping. He notes that Creditor in testimony conceded surrendering time cards when paid, only to later produce copies of others. However, Creditor credibly testified that keeping cards, or copies, became important when Debtor started failing to fully pay. In addition, even Debtor, after testifying as to his shredding or otherwise destroying time cards, "found" a number of the time cards later during discovery.

Debtor conceded that he kept inadequate employment records. Under the circumstances, critiquing Creditor's efforts at record keeping is the equivalent of the pot calling the kettle black, and it was totally ineffective. As between Debtor and Creditor, and as will be discussed further *infra*, the burden was on Debtor to keep adequate employment records.

---

[14]  In addition, Debtor provided no credible basis to dispute the asserted "amounts earned" in 2010 through 2012, all of which were in the $31,000 to $35,000 range. Given those amounts, and the $30,000 to $32,000 range in 2007–2008 established by Debtor's own documents, Creditor's contention of $5,800.00 in earned but unpaid wages in 2009 is consistent with the amount that would be earned yearly when compared to the years both preceding and following 2009. The proposition effectively advanced by Debtor, that Creditor worked substantially less in 2009 and is not owed any unpaid wages for that year, was not established.

MEMORANDUM OF DECISION - 10

### c. The amounts paid

Creditor admits that substantial components of the amounts earned were paid. The payments were in cash. Debtor kept and retained no records to impeach Creditor's assertions of the amounts received, and he provided no evidence of any other or further payments.[15]

Moreover, Debtor conceded during his examination that he not only irregularly paid Creditor (on "roughly" a two-week basis), he also fell behind in paying him. Debtor admitted, as will be discussed further, that he owed Creditor unpaid wages at the time the bankruptcy petition was filed in January 2013. Indeed, it was those unpaid wages that led to Debtor's lump sum, post-bankruptcy payments in April 2013.

Debtor's testimony that he "fully paid" Creditor in 2009 through 2011 lack corroboration. And, while Debtor disputes Creditor's assertion of the amounts unpaid, Debtor relied solely on Creditor's records and information in determining what was owed and to be paid. The awkwardness of relying on Creditor's assertions and simultaneously contesting his assertions was not overcome.[16]

---

[15]   While the evidence suggests Debtor withdrew a good deal of cash, there was no documentation, accounting or records establishing what Debtor did with the cash. Debtor also acknowledged he commingled personal and business expenses.

[16]   In addition to the evidentiary issues noted, Debtor's approach to his business and record keeping appears to violate applicable state regulations. Under Oregon Administrative Rule (OAR) 839-020-0080(1), employers must maintain and preserve payroll or other records

(continued...)

MEMORANDUM OF DECISION - 11

The Court finds, on the weight of the credible evidence, that the amounts earned and the amounts paid were as asserted by Creditor.

### d.    Amounts owed at bankruptcy

Debtor filed his chapter 12 petition on January 4, 2013.  Doc. No. 1. Debtor acknowledged that amounts were owed Creditor for work performed prior to filing his petition.  Creditor's evidence and testimony establishes the amount of unpaid wages through the end of 2012 was $42,229.00.  An additional $4,312.50 was earned in 2013 post-petition.

Debtor explained that, in addition to other 2013 payments totaling $3,000.00,[17] he caused two checks in the amounts of $2,000.00 and $9,000.00 to be paid to Creditor.  Ex. 102 at 7–8.  Those checks were on the account of Micheal Hess, Debtor's son, who ranches in Elko, Nevada.

Notwithstanding his admitted awareness of being "short" in 2012, Debtor neither listed Creditor in his bankruptcy schedules nor provided notice of the bankruptcy to him.  Creditor had continued working for an extended period

[16] (...continued)
including employees' identifying information, the regularly hourly rates of pay, the hours worked each workday and the total daily or weekly earnings or wages due, the wages paid, and the date paid and the work period covered by the payment.  In addition to this record keeping requirement, the employer must provide the employee at the time of payment with a written itemized statement.  OAR 839-020-0012.  The Court is aware that Debtor paid in cash, but that does not excuse Debtor's lack of record keeping or failure to comply with Oregon statutes or regulations.

[17]  Exhibit 102 at 6 reflects Creditor's acknowledgment of payments of $2,000.00 on January 14, 2013, and $1,000.00 on March 11, 2013.  Both were post-petition payments.

MEMORANDUM OF DECISION - 12

without being fully paid over the objections of family and friends.[18]  But upon

discovering the bankruptcy filing, Creditor had enough and quit on March 15,

2013.  The $11,000.00 was delivered to Creditor on or about April 3, 2013.

Debtor claims that satisfied all then-outstanding obligations and back wages.

 Context is significant.  Not only did Debtor omit a known creditor from the

chapter 12 filing,[19] he also made payments to that creditor after bankruptcy

which—at least in part—paid prebankruptcy debts.  Debtor did so without a

confirmed plan or Court approval.  In addition, Debtor acquired funds from his

son, post-petition, which were used to make this payment.  The chapter 12 record

is bereft of disclosure regarding this transaction, including whether it was a loan, a

gift, receipt of a receivable, or something else.[20]

 But beyond the question of context, the parties debate the proper

"application" of Debtor's payments, including the post-petition payments totaling

$14,000, which is the focus of this Decision.

---

[18]  Creditor testified that this constant underpayment of earned wages caused ongoing difficulties for his family.  He also admitted he had been encouraged to quit earlier.  But he stayed on as Debtor repeatedly promised to catch up the delinquent payments.

[19]  Debtor testified that it "didn't occur to him" to list Creditor.  He also said he knew money would be coming from his son soon, and he therefore told Creditor money was coming and would be used to pay back wages owed.

[20]  It is beyond the scope of today's Decision to address Debtor's compliance with the Code and Rules in scheduling creditors and assets, making disclosures, accounting and reporting, acquiring required approvals for transactions or authority for non-plan payments on pre-petition debts.  The details of these issues were also not made clear at the time of confirmation.

MEMORANDUM OF DECISION - 13

**DISCUSSION AND DISPOSITION**

    **A.    Standards applicable to claim objections generally**

This Court has previously summarized:

> Once a proof of claim is filed, it is prima facie evidence of the claim's validity, Rule 3001(f), and is deemed allowed unless a party in interest objects under § 502. *See Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). Once an objection is made, a proof of claim is still sufficient absent evidence of its invalidity. *Id.* (citing *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)). The burden of providing evidence of a proof of claim's invalidity rests with the objector. *Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 706–07 (9th Cir. BAP 2006). If a debtor produces evidence to rebut the presumption of validity, the burden of persuasion shifts back to the claimant. *Id.*

*In re Holliday*, 11.2 I.B.C.R. 97, 97, 2011 WL 2518845, *2 (Bankr. D. Idaho June 23, 2011); *see also In re Parrott Broad. Ltd. P'ship*, 492 B.R. 35, 38 (Bankr. D. Idaho 2013).

In proof of claim litigation under § 502(b)(1), the validity of the claim is determined under applicable nonbankruptcy law. *Mandalay Resort Grp. v. Miller (In re Miller)*, 292 B.R. 409, 412 (9th Cir. BAP 2003); *see also Parrott Broad.*, 492 B.R. at 40 (citing *Johnson v. Righetti (In re Johnson)*, 756 F.2d 738, 741 (9th Cir. 1985)). Here, Oregon law applies as Debtor resides and farms in Oregon, and the hiring, work, and payment of Creditor all occurred in Oregon.

The Objection asserts there is no amount owed Creditor for back wages, and the claim should be disallowed "in full." Debtor also indicated in preliminary

MEMORANDUM OF DECISION - 14

submissions that documents were still being reviewed, and the amount of wages owed and cash paid would be verified.  This never occurred.  As the findings above reflect, Debtor provided no competent evidence to establish that (a) no debt was owed Creditor or (b) the amount of unpaid wages was less than Creditor asserted.  The presumption of validity was not rebutted.  Even if rebutted, the Court concludes Creditor sustained the burden of persuasion as to the existence, and amount, of the claim.[21]

### B.    The amount of the claim

When considering an objection to claim, the Court must determine the amount of such claim as of the date of the filing of the petition.  *See* § 502(b). Given the evidence, the Court finds and concludes the total outstanding pre-petition wage claim was $42,229.00.

### 1.    Application of payments

Creditor asserts a total of $4,312.50 in unpaid 2013 wages.[22]  Debtor contends the entire $14,000 paid in 2013 should be used to satisfy the 2013 post-petition wages and the $9,567.50 in unpaid 2012 wages.[23]  Debtor's methodology

---

[21]   An employee asserting a claim against an employer under the Oregon Wage Claim Act must prove the agreement, express or implied, which gives him the right to expect compensation.  *Leonard v. Arrow-Tualatin, Inc.*, 708 P.2d 630 (Or. 1985).  Creditor has done so.

[22]   Post-petition labor claims would be administrative expenses.  *See* § 503(b)(1)(A)(i). The Plan provided for full payment of all administrative expenses.  Doc. No. 89 at 5.

[23]   Debtor does not admit to any specific amount of such wages, only acknowledging that
(continued...)

MEMORANDUM OF DECISION - 15

would leave $120.00 to apply to 2011 unpaid wages and would result in a
$32,541.50 general, unsecured claim.  There would be no administrative expense
and no priority claim.

Creditor, however, uses an approach that deems payments applied to the
earliest of the unpaid wages (starting in 2009).  This approach would leave
Creditor with an administrative expense of $4,312.50 (the post-petition wages), a
priority claim under § 507(a)(4) of $12,475.00,[24] and a general, unsecured claim
for the remaining balance of $15,754.00.[25]

The Court finds there was no agreement between Debtor and Creditor as to
how the payments (both pre-petition and post-petition) were to be applied, *i.e.*,
whether to the most recent unpaid wages or the oldest unpaid wages.

Prior to November 2009, Debtor paid Creditor in full within 5 days of the
conclusion of bi-weekly pay periods, and it was clear that the payments covered

---

[23] (...continued)
he was "short" some amount due Creditor when he filed.

[24]  Section 507(a)(4) provides a priority status to allowed unsecured wage claims to the
extent of $12,475.00 if the same are "earned within 180 days before the date of the filing of the
petition[.]"  It is clear from Creditor's records and calculations that more than $12,475.00 was
earned in the 180 days prior to January 4, 2013.  Those 180 days would have commenced July 8,
2012.  Creditor's documents indicate he worked 1,555 hours from July 8, 2012, through January
4, 2013, which, at $10.00 per hour, totals $15,550.00.  *See* Ex. 302 at 19–22 (7/8/12 appears as
the last line on one time card on p. 23.  The hours on that line are added to the biweekly time
cards thereafter in 2012.  *See* pp. 23, 22, 21, 20 and 19 in that order.  The last relevant time card,
found on p. 19, runs through 1/6/13.  The hours on the last two days of that time card are
subtracted in order reach the January 4, 2013 filing date).

[25]  Total pre-petition wage claims of $42,229.00 less the priority portion of $12,475.00
leaves $29,754.00.  Applying the $14,000 payment to the earliest wages due leaves $15,754.00 as
a general unsecured claim.

MEMORANDUM OF DECISION - 16

wages for a specific period of time.  *See* Ex. 301.  However, once Debtor switched
to cash payments, his payments became sporadic.  And there were no documents
to identify the pay period or periods to which the payments applied.  Nor can the
Court from the evidence admitted connect the payments with any given pay
period.  While Creditor continued to provide bi-weekly time cards, the payments
no longer regularly occurred within 5 days of the end of those time periods, nor
did the amounts coincide with the hours worked.  Consequently, Debtor and
Creditor's prior pay arrangement is of little assistance.

Debtor argues that as the payor, he should be able to direct the allocation of
the payments.  Debtor's argument is unpersuasive because the Court concludes he
did not so designate at the time he made payments to Creditor.[26]  Equally
unpersuasive is Creditor's assertion that the parties understood and intended all
payments to apply toward the older unpaid wages.  Thus Debtor did not direct the
allocation of the funds at the time he made the payments, nor did Creditor
articulate how he was applying such payments.  Their attempts to do so now for
their own respective benefit are unsuccessful as a matter of evidence.

The parties similarly fail to provide the Court with legal authority
controlling the question.  Nothing in the Oregon statutes addresses allocation of

---

[26]  The Court does not credit Debtor's testimony that at the time of the April 2013
payment he instructed Creditor that he was paid in full, nor the argument that the conversation
amounted to an instruction that the funds be applied to 2013 and then 2012 past due wages.

MEMORANDUM OF DECISION - 17

payments.  While ORS 652.120 requires employers to pay unpaid wages within a specific time, it contemplates payment in full.  The statute does not address how payments are to be allocated to past due wages.

However, the Restatement (Second) of Contracts §§ 258–260 (1981) addresses the application of payments as between two or more matured debts.  In addition, Oregon courts have cited the Restatement (Second) of Contracts with approval.  *See Keith Brown Lumber Yard v. B&L Electric, Inc.*, 48 P.3d 209, 212 (Or. App. 2002) (analyzing and applying Restatement § 258 to determine allocation of payments).

Under the Restatement, Debtor had the first opportunity to allocate payments.  *See* Restatement (Second) of Contracts § 258.  If Debtor failed to so allocate, as the Court concludes happened here, the Restatement next gives Creditor the ability to allocate those payments, but he must manifest his intention within a reasonable time to Debtor.  *See* Restatement (Second) of Contracts § 259. That did not occur here.

The Restatement (Second) of Contracts § 260 guides the Court when neither the payor nor the payee have directed application of payments.  It states:

> (1) If neither the debtor nor the creditor has exercised his power with respect to the application of a payment as between two or more matured debts, the payment is applied to debts to which the creditor could have applied it with just regard to the interests of third persons, the debtor and the creditor.

> (2) In applying payments under the rule stated in Subsection (1), a

MEMORANDUM OF DECISION - 18

> payment is applied to the earliest matured debt and ratably among debts of the same maturity, except that preference is given
>
> > (a) to a debt that the debtor is under a duty to a third person to pay immediately, and
> >
> > (b) if he is not under such a duty,
> >
> > > (i) to overdue interest rather than principal, and
> > >
> > > (ii) to an unsecured or precarious debt rather than one that is secured or certain of payment.

Under this provision, the payments made should cover the oldest obligations first.

Such an allocation in this case not only complies with the Restatement, but it also comports with Oregon's many codified protections for employees and is equitable. *See generally A.J. Rinella & Co., v. Bartlett (In re Bartlett)*, 367 B.R. 21, 26–28 (Bankr. D. Mass 2007) (discussing the application of the Restatement and citing many jurisdictions that have recognized the equity of this process). This Court, as a court of equity, will so allocate the payments.

Therefore, Debtor's payments, including the $14,000 paid to Creditor post-petition, are applied to the oldest unpaid wages. As a result, Creditor is entitled to an administrative expense of $4,312.50 for his 2013 unpaid wages, a priority unsecured claim of $12,475.00 for his unpaid wages arising within 180 days of the filing, and a general unsecured claim for the balance of the pre-petition unpaid wages, in 2012 and earlier, in the amount of $15,754.00.

MEMORANDUM OF DECISION - 19

### C.    Additional components of the claim

Creditor asserts additional amounts must be allowed under applicable state law.  He contends that, under Oregon law, he is entitled to a "penalty wage claim" of $2,400.00.  He also asserts he is entitled to allowance of attorneys' fees of $2,625.00 and costs of $1,143.00.

### 1.    Penalty wage claims under Oregon law

Creditor quit work, without providing at least 48 hours' notice, on March 15, 2013.  Under ORS § 652.140(2)(c), Debtor was obligated to pay what he estimated was due and payable within five days and, once Creditor provided time records, to pay all wages earned and unpaid within five days of such provision. Because the wages were not so paid (Debtor making the only post-March 15 payment via two checks in April 2013), ORS § 652.150(1) imposes a penalty calculated at the employee's hourly rate (here $10.00/hour) for 8 hours per day until paid but capped at a maximum period of 30 days.  *See also North Marion School Dist. No. 15 v. Acstar Ins. Co.*, 169 P.3d 1224 (Or. 2007) (determining penalty wages are punitive in nature, not compensatory, and are designed to spur the employer to make payment of wages when due).[27]  Creditor consequently claims a right to a "penalty wage" of $2,400.00 (*i.e.*, $10/hour x 8 hours/day x 30

---

[27]   The statute requires "willful" failure to pay.  *See* ORS § 652.150(1).  However, this requires only an intentional and volitional act, and excludes any requirement to determine good faith or bad faith.  *McCauley v. ASML US, Inc.*, 917 F. Supp. 2d 1143, 1155 (D. Or. 2013); *Wells v. Carlson*, 717 P.2d 640 (Ore. 1986).

MEMORANDUM OF DECISION - 20

days).

However, ORS § 652.150(5) states "[t]he employer may avoid liability for the penalty described in this section by showing financial inability to pay the wages or compensation at the time the wages or compensation accrued." Debtor argues that "the evidence is uncontradicted that in 2012 and 2013, Mr. Hess was financially unable to pay what was owed." Doc. No. 145 at 11–12.

There is little evidence as to Debtor's financial ability or inability to pay the wages at the time Creditor quit. Debtor testified that he did not have the money to pay Creditor, and had to rely on the funds obtained from his son. Creditor did not dispute Debtor's characterization of his financial condition, though he did point to Debtor's cash deposits and withdrawals. *See e.g.,* discussion *supra* note 12. Creditor's focus on Debtor's pre-petition cash withdrawals does not assist the Court in evaluating Debtor's financial condition after Creditor quit and when Debtor's payment of accrued wages was due for purposes of ORS § 652.150. On the evidence presented, the Court concludes the penalty wage will not be imposed.

### 2. Attorneys' fees and costs

Oregon Revised Statute § 652.200(2) states that:

> In any action for the collection of wages, if it is shown that the wages were not paid for a period of 48 hours, excluding Saturdays, Sundays and holidays, after the wages became due and payable, the court shall, upon entering judgment for the plaintiff, include in the judgment, in addition to the costs and disbursements otherwise prescribed by statute, a reasonable sum for attorney fees at trial and on appeal for prosecuting the action, unless it appears that the employee

MEMORANDUM OF DECISION - 21

> has willfully violated the contract of employment or unless the court finds that the plaintiff's attorney unreasonably failed to give written notice of the wage claim to the employer before filing the action.

Creditor sent several demand letters for the unpaid wages, *see* Ex. 309, and it is effectively undisputed that he gave Debtor notice under the Oregon statute. The Court finds Creditor is entitled to attorneys' fees and costs. However, beyond asserting $2,625.00 is a reasonable attorneys' fee and alleging $1,143 are necessary costs, Creditor has not, as yet, proven those amounts. The Court will require Creditor to provide an itemized statement supporting all fees and costs claimed within 7 days. Debtor will have 7 days to respond. The Court will then resolve the question of the amount of the allowance (and do so solely on the submissions, without oral argument) and will add the reasonable fees and costs to Creditor's unsecured claim.

## CONCLUSION

For the reasons stated, the Objection will be overruled. Creditor is allowed an administrative expense under § 503(b)(1)(A) in the amount of $4,312.50 for post-petition unpaid wages. Creditor is also allowed a priority unsecured claim of $12,475.00 and a general, non-priority unsecured claim of $15,754.00 plus reasonable fees and costs. The Court will determine the amount of such fees and costs after the noted submissions are filed.

Debtor's confirmed Plan provides for 100% payment to holders of unsecured claims. Debtor's Plan must be modified to the extent required to pay

MEMORANDUM OF DECISION - 22

Creditor's allowed administrative expense and priority claim.  *See* § 1222(a)(2).

An Order, consistent with the foregoing, will be entered by the Court.

DATED:  June 6, 2014

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 23